**FILED**

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Jason A. Julien (312) 886-4156

**FILED**

AUG 01 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AUG 01 2019

MAGISTRATE JUDGE
JEFFREY T. GILBERT

UNITED STATES OF AMERICA

v.

MARC CAJIGAL

CASE NUMBER:

**19 CR 624**

**CRIMINAL COMPLAINT**    MAGISTRATE JUDGE GILBERT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

## COUNT ONE

On or about July 19, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally distribute a controlled substance, namely, a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance |

## COUNT TWO

On or about July 24, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally distribute a controlled substance, namely, a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance |

## COUNT THREE

On or about July 31, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | did knowingly and intentionally attempt to possess with intent to distribute a controlled |

substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1)

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

ALISON TEEVAN
Task Force Officer, Drug Enforcement Administration

Sworn to before me and signed in my presence.

Date: August 1, 2019

*Judge's signature*

City and state: Chicago, Illinois

JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### **AFFIDAVIT**

I, ALISON TEEVAN, being duly sworn, state as follows:

1.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been so employed since approximately November 2017. Prior to serving as a Task Force Officer, I was a police officer with the Mount Prospect Police Department from approximately February 2007 to November 2017. I am currently assigned to the DEA Chicago Field Division, and my responsibilities include the investigation of narcotics trafficking offenses.

2.      This affidavit is submitted in support of a criminal complaint alleging that MARC CAJIGAL has violated Title 21, United States Code, Sections 841(a) and 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CAJIGAL with distribution of narcotics and attempted possession of narcotics with intent to distribute, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offenses alleged in the complaint.

3.      This affidavit is based on my personal knowledge; information provided to me by other law enforcement agents; interviews of witnesses; my own observations and actions; my experience and training; the experience of other agents; my review

of audio and video recordings and other evidence, including seized narcotics;[1] my interview of CAJIGAL; and my discussions with a Niles Police Department ("NPD") confidential source (the "CS").[2]

## FACTS SUPPORTING PROBABLE CAUSE

### *Background of the Investigation Into CAJIGAL*

4.     In or around June 2019, the CS informed the DEA and NPD that CAJIGAL was dealing in methamphetamine. The CS provided CAJIGAL's real name.

5.     The CS indicated to law enforcement that s/he has known CAJIGAL for approximately three months, and purchases one to two ounces of methamphetamine from CAJIGAL per week. The CS further related to law enforcement that CAJIGAL told the CS that CAJIGAL has up to five pounds of methamphetamine in his

---

[1] The investigation included the use of consensually recorded telephone calls and audio/video recorded meetings involving an undercover officer. The transcripts of the conversations described in this affidavit remain in draft form; to the extent quotations from the conversations are included, they are preliminary, not final. The summaries of unrecorded and recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations. In certain instances, I will offer my interpretations of certain recorded conversations in brackets and otherwise. My understanding of these conversations is aided by the understanding of the participating undercover agent, the contents and context of the conversations, my familiarity with the facts and circumstances of the investigation, my experience as a law enforcement officer, my discussions with other law enforcement agents and officers, the experience of other law enforcement agents and officers in this investigation, and other evidence developed during the course of this investigation. The times listed for the recorded conversations are approximate.

[2] The CS is a cooperating defendant for the NPD as a result of a retail theft and possession of a controlled substance (methamphetamine) arrest on or about June 21, 2019. The CS is cooperating in exchange for having this charge dismissed against him/her. Thus, this is the first case Niles PD has worked with the CS. However, since that time, the CS has provided intelligence on an additional four subjects (aside from CAJIGAL) involved in methamphetamine sales in the Chicago area, which has been corroborated. The CS has two misdemeanor convictions from May and September of 2000 (both for possession of liquor by a minor and providing a peace officer with a false name), and one felony conviction for possession of methamphetamine from 2017.

possession at one time. The CS further related that CAJIGAL drives a newer model silver Nissan and provided CAJIGAL's telephone number: (630) 822-6361.

6.     After receiving this information from the CS, an NPD officer obtained CAJIGAL's Illinois driver's license photograph from Illinois Secretary of State records. The CS confirmed that the photograph depicted CAJIGAL, from whom s/he had purchased methamphetamine. Illinois Secretary of State records also confirmed that a 2018 silver Nissan Maxima is registered to CAJIGAL under Illinois registration #BN42263.

### On or about July 19, 2019, the CS and an Undercover DEA Task Force Officer Purchased 35.9 Grams of Methamphetamine from CAJIGAL

7.     On or about July 17, 2019, or July 18, 2019, at the direction of law enforcement, the CS contacted CAJIGAL, who was using phone number (630) 822-6361.[3] During this unrecorded call, the CS requested to purchase an ounce of methamphetamine from CAJIGAL.  According to the CS, during their conversation, CAJIGAL indicated to the CS that he could supply the CS anytime.

8.     On or about July 19, 2019, at approximately 7:30 p.m., the CS contacted CAJIGAL, who was using phone number (630) 822-6361. This call was unrecorded,

---

[3] Law enforcement identified the user of telephone number (630) 822-6361 as CAJIGAL in the following way: I conducted a search through a law enforcement database, which revealed that the telephone number (630) 822-6361 is a mobile phone number associated with CAJIGAL, serviced by T-Mobile. In addition, CAJIGAL speaks with a distinct accent and English is not his first language. I heard CAJIGAL's distinct accent during the calls between him and the CS on July 17, 2019, and July 19, 2019, while the CS had the calls on speakerphone. I then recognized CAJIGAL's voice during our first in-person meeting, described below at Paragraph 15. When CAJIGAL called me directly from (630) 822-6361 on July 23, 2019, as set forth below in Paragraph 21, I heard the same voice. Additionally, as set forth below in Paragraph 21, CAJIGAL introduced himself as "Marc" when he texted me from (630) 822-6361 on July 23, 2019.

and took place in the presence of the UC. The CS spoke to CAJIGAL via speakerphone, allowing the UC to hear both sides of the conversation. The CS advised that s/he and his/her friend, who, unbeknownst to CAJIGAL was an undercover DEA Task Force Officer (the "UC"), wished to purchase "a zip" [one ounce of methamphetamine]. CAJIGAL stated, in summary, that was fine, and instructed the CS to meet him at a Bed Bath and Beyond located on North Broadway Street, in Chicago. CAJIGAL did not provide the CS with a price for the methamphetamine during this conversation. The UC obtained $750 of DEA Official Advanced Funds ("OAF") to use for the anticipated purchase of methamphetamine.

9. After the phone call between the CS and CAJIGAL, the NPD and the DEA established surveillance on and in the vicinity of the Bed Bath and Beyond on North Broadway Street.

10. At this time, the UC and CS, utilizing an undercover vehicle, travelled to the area of the Bed Bath and Beyond. Law enforcement searched the CS for contraband before the CS entered the undercover vehicle with the UC, which yielded negative results.

11. At approximately 8:20 p.m., after arriving and parking on the top-level parking lot of the Bed Bath and Beyond, the CS contacted CAJIGAL on (630) 822-6361 and advised him s/he and the UC had arrived. This call was not recorded, and took place in the presence of the UC. The CS spoke to CAJIGAL via speakerphone, allowing the UC to hear both sides of the conversation. During this call CAJIGAL advised, in summary, that he was parked on the street directly in front of the nearby

4

Walmart, located at 2844 North Broadway Street, Chicago, Illinois, and instructed the CS and UC to come to his location.

12.     Surveillance officers located and observed CAJIGAL parked on Broadway Street in his silver Nissan Altima. Law enforcement observed CAJIGAL seated in the driver's seat of the Nissan, and observed that he was the sole occupant of the vehicle. Law enforcement maintained surveillance on the Nissan during the meeting between CAJIGAL and the UC and CS.

13.     At approximately 8:27 p.m., the UC and CS relocated the undercover vehicle and parked directly across the street from CAJIGAL's Nissan. The CS then exited the undercover vehicle and entered into the front passenger seat of CAJIGAL's Nissan. After approximately five minutes, both the CS and CAJIGAL exited CAJIGAL's vehicle and walked over to the UC, who was still seated in the driver's seat of the undercover vehicle.

14.     The CS then entered into the front passenger seat of the undercover vehicle while CAJIGAL waited outside of the front passenger side of the vehicle on the sidewalk. After entering the vehicle, the CS removed a clear plastic baggie that contained a white/clear rock-like substance (suspected methamphetamine) from his/her bag and provided it to the UC. The CS advised the UC that CAJIGAL provided the methamphetamine to the CS while s/he was in his vehicle, and the price was $520. The UC then removed $520 in DEA OAF, placed it into an empty cigarette box, and handed the cigarette box to CAJIGAL thru the open passenger side window.

15. After providing the money, the UC held a brief casual conversation with CAJIGAL, thanking him for meeting. CAJIGAL stated it was no problem and advised he "is always around." CAJIGAL and the UC and CS then parted ways without further incident.

16. Immediately after the transaction, the UC and CS met with assisting police personnel at a pre-determined location. The CS was searched for contraband, which yielded negative results. The UC provided a DEA Task Force Officer with the suspected methamphetamine. The Task Force Officer, as witnessed by a DEA Special Agent, then transported the suspected methamphetamine to the Chicago DEA Field Division where it was weighed and field-tested. The white/clear rock-like substance provided by CAJIGAL field tested positive for the presence of methamphetamine and weighed approximately 35.9 grams.

17. A DEA Special Agent and the UC then conducted a debrief interview with the CS during which time s/he provided the following information (in summary):

a. The CS advised that upon entering CAJIGAL's Nissan, they held a brief conversation during which CAJIGAL advised the CS he was currently staying at a house on "Winona." The CS informed law enforcement that based on having been to the house on "Winona" him/herself on prior occasions, s/he knew CAJIGAL was referring to a residence at 1444 West Winona, in Chicago, which is commonly utilized as a "flop house"[4] for methamphetamine users and dealers.

---

[4] A "flop house" is street terminology for a common residence or apartment utilized by various narcotics dealers to sell narcotics out of, and for various narcotics users to use narcotics within.

b.      The CS stated that CAJIGAL advised, in summary, that he was running low on product, and would have to order more soon. The CS stated CAJIGAL then removed the bag of suspect methamphetamine from the vehicle's center console directly underneath the radio and provided it to the CS.

c.      The CS stated s/he and CAJIGAL then negotiated the price of $520, and it was at this time the CS discussed with CAJIGAL that the UC had the money for the purchase and that the UC would be a "good customer" for CAJIGAL in the future. The CS stated CAJIGAL seemed happy with this prospect, and that was when they both walked over to the undercover vehicle.

### On or About July 23, 2019, CAJIGAL Communicated with the UC About Purchasing Methamphetamine Via the Dark Web

18.      On July 22, 2019, law enforcement met with the CS and directed the CS to contact CAJIGAL on (630) 822-6361 in the presence of a DEA Special Agent and the UC. This call was not recorded. The CS spoke to CAJIGAL via speakerphone, allowing the UC to hear both sides of the conversation.

19.      During this call, CAJIGAL complained to the CS, in summary, that he was running low on both money and that his "supply" was gone, and that he only had "personal" left. CAJIGAL used the word "crystal" during this conversation, which, based on my training, experience, and knowledge of the investigation, refers to methamphetamine. CAJIGAL referenced being recently robbed of both money and "supply" [methamphetamine], and added that numerous customers owed him money for methamphetamine that he had previously supplied them with. In response, the CS reminded CAJIGAL of the UC. The CS told CAJIGAL, in summary, that the UC

has a steady job and source of money. Further, the CS told CAJIGAL that the UC knows how to order narcotics via the "dark web."[5]

20. CAJIGAL asked the CS to give the UC his phone number, and also asked for the UC's phone number. CAJIGAL told the CS, in summary, that he was going to contact the UC the next day to discuss the possibility of the UC ordering "crystal" [referring to methamphetamine] for him through the dark web, and further stated that he wanted to order two pounds.

21. On July 23, 2019, at approximately 1:18 p.m., the UC received a text message from CAJIGAL, who was using (630) 822-6361. CAJIGAL identified himself as "Marc," a friend of the CS, and asked the UC to call him. The UC called CAJIGAL on (630) 822-6361 at approximately 3:57 p.m. and spoke to CAJIGAL for approximately nine minutes. This call was recorded.

22. During this conversation, CAJIGAL asked if the UC had spoken to the CS, to which the UC acknowledged and stated, in summary, that s/he was aware of what CAJIGAL wanted to do (referring to the UC ordering two pounds of methamphetamine for CAJIGAL via the dark web). The UC then asked CAJIGAL if he currently "ha[d] anything right now" [referring to methamphetamine for sale], to which CAJIGAL replied, "Just my personal stash right now, but I could do an 'eight

---

[5] The "dark web" is a term used to describe an illicit internet marketplace that is often utilized for criminal activity including, but not limited to, narcotics sales involving the shipment of narcotics thru the mail and payment in the form of cryptocurrency.

ball.'"[6] CAJIGAL used the phrase "eight ball" multiple times during this conversation.

23. CAJIGAL then informed the UC he was recently robbed twice, and lost "eleven thousand and a pound and a half," but commented "it's the nature of the game it is what it is." The UC and CAJIGAL then briefly discussed aspects of ordering narcotics via the dark web, and tentative plans for the UC to place an order on CAJIGAL's behalf. CAJIGAL told the UC, "I wanna get a shipment before the weekend if I could because I am totally out."

24. The UC and CAJIGAL then agreed to meet the following day to discuss details of placing an order via the dark web, and also for CAJIGAL to provide the UC with 3.5 grams of methamphetamine.

### On or about July 24, 2019, the UC Purchased 7.8 Grams of Methamphetamine from CAJIGAL, and They Discussed the UC Purchasing Two Pounds of Methamphetamine for CAJIGAL on the Dark Web

25. On or about July 24, 2019, at approximately 6:36 p.m., the UC contacted CAJIGAL on (630) 822-6361. During this call, which was recorded, CAJIGAL and the UC agreed to meet in an apartment complex parking lot in Mount Prospect, Illinois, located on South Elmhurst Road. CAJIGAL did not provide the UC with a price for the methamphetamine during the call. As a result, the UC obtained $400 in DEA OAF to use for the anticipated purchase of methamphetamine. The UC was also equipped with a video and audio recording device.

---

[6] An "eight ball" is street terminology for 3.5 grams of narcotics.

26.     After this phone call, law enforcement established surveillance on and in the vicinity of the apartment complex on South Elmhurst Road. The UC also established a covert position within the apartment building.

27.     At approximately 8:34 p.m., CAJIGAL contacted the UC from (630) 822-6361 and stated he had arrived. At the same time, surveillance officers observed CAJIGAL walking up to the front porch area of the apartment building at 1300 South Elmhurst Road carrying a black satchel type bag. A short time later, the UC exited out of the building and greeted CAJIGAL. This meeting was recorded. After a brief conversation, the UC and CAJIGAL relocated from the porch to the east side of the parking lot and sat on the curb before resuming conversations.

28.     After sitting down, CAJIGAL and the UC began to discuss the basic factors in ordering narcotics thru the dark web, including how different vendors can have different rankings, reviews, and prices. The UC then provided CAJIGAL with a piece of paper that broke down the prices of three different dark web vendors currently selling methamphetamine in pound quantities.

A handwritten note reading:

① ★ Hector Salamanca ★ A
4 oz = $1660 + $12 shipping
1 lb = $2640
× 2 = $5280
with shipping $5376

= $168 per ounce
$6 per g

★ Fast, accurate, good price! best

② Trust level 9. Big clients (41 kilos in 4 mths)
DiCapri
1 lb = $2835
× 2 = $5670

= $177.19 per oz
$6.33 per g

★ Has Fire stuff
★ FREE SHIPPING

③ No Love 2323
1 lb = $3,000 + $20 ship
× 2 = $6,000
w/shipping = $6040

= $188.75 per oz
$6.74 per g

★ Best return policy! will reship if not recieved

all USPS
all give tracking #'s

29.     The UC mentioned to CAJIGAL that the UC does not normally order amounts as large as CAJIGAL wanted, and CAJIGAL responded, "I can do a kilo a week." CAJIGAL then told the UC "I have two eight balls in one bag" [he brought two "eight balls" of methamphetamine with him in his bag], and stated further, "Can we go up? Need to weigh it," [referring to needing to weigh the methamphetamine to split it up]. In response, the UC told CAJIGAL, in summary, that s/he would just purchase both.

30.     The UC and CAJIGAL then resumed discussing the order CAJIGAL wanted to place on the dark web, at which point CAJIGAL confirmed he wished to purchase two pounds of methamphetamine.

31.     The UC and CAJIGAL then had the following conversation:

**UC:** "If you want I can order it for you but we need to come to some agreement about the money...I don't want to be involved in your sales."

**CAJIGAL:** "No, I know."

**UC:** "If I order it, I can front the money but when I give it to you I expect to be paid back."

**CAJIGAL:** "Of course."

**UC:** "Like, when I hand it over to you, when I hand you the package...I would expect whatever the price is."

**CAJIGAL:** [nods in affirmation]

**UC:** "I'm telling you know I can order it, I can put up the money, but I'm telling you when it comes you gotta pay me back, not I'm gonna go sell it all and then pay me. Is that fair?"

**CAJIGAL:** "Yes, that's fair."

**UC:** "As soon as it comes in, and I'll give you the tracking number, just meet me again here and I'll give it to you minus my two ounces and you bring me the balance."

**CAJIGAL:** "OK, fair enough. Where do you want to ship it?"

**UC:** "Here."

**CAJIGAL:** "OK."

32.     Based on my training and experience, and knowledge of the investigation, during this portion of the conversation, the parties discussed, in

summary, that the UC would utilize the dark web to purchase two pounds of methamphetamine on behalf of CAJIGAL. The UC would use his/her own money to make the purchase, and have the shipment of methamphetamine delivered to the UC's apartment. Upon receiving the narcotics, the UC would contact CAJIGAL, who would then meet with the UC. During this meeting, CAJIGAL would pay the UC in cash for the cost of the order, and the UC would then give CAJIGAL the package containing the methamphetamine. The UC and CAJIGAL also discussed additional details, including the UC providing CAJIGAL with the tracking number and the UC keeping approximately two ounces of the methamphetamine.

33.     Prior to ending the meeting, CAJIGAL removed a plastic bag containing a white/clear rock-like substance (suspected methamphetamine) from the black bag he had with him, and provided it to the UC. CAJIGAL initially tried to give the narcotics to the UC for free. The UC asked CAJIGAL how much he normally charged for one "eight ball" to which CAJIGAL responded, "$100." The UC subsequently provided CAJIGAL with $200 in DEA OAF. CAJIGAL and the UC agreed to speak the following day and parted ways without incident.  Law enforcement observed CAJIGAL return to his Nissan Maxima and leave the area.

34.     Immediately after the meeting, the UC met with assisting police personnel at a pre-determined location during which time the UC provided a DEA Special Agent with the suspected methamphetamine. The Special Agent, as witnessed by the UC, then transported the suspected methamphetamine to the Chicago DEA Field Division where it was weighed and field-tested. The white/clear

rock like substance provided by CAJIGAL field tested positive for the presence of methamphetamine and weighed approximately 7.8 grams.

### On or About July 26, 2019, the UC and CAJIGAL Confirmed the Order for Two Pounds of Methamphetamine Over the Dark Web

35.     On July 26, 2019, at approximately 7:54 p.m., the UC received a call from CAJIGAL, who was using (630) 822-6361. This call was recorded. During this call, in summary, the UC confirmed that CAJIGAL still wanted the UC to order "two pounds" [two pounds of methamphetamine]. The UC then advised CAJIGAL s/he would check the dark web immediately following their phone call, and text CAJIGAL the total price with shipping. The UC asked CAJIGAL if he would have the money for the order if the shipment were to arrive to which he responded, "Yea. Of course."

36.     After concluding the phone call at approximately 9:05 p.m., the UC sent CAJIGAL a screenshot image of a dark web vendor that depicted the price-per-pound of "cartel crystal meth" [methamphetamine] to be $2,650 per-pound. The screenshot also lists a picture of a substance that, based on my training and experience, is consistent with methamphetamine.



37.     The UC and CAJIGAL then had the following text message exchange:

**UC:** "Price would be $5,396. That includes shipping. It went up $20 since Wednesday."

**CAJIGAL:** "Got it. u should have ok ordered it wednesday then.....lol"

**UC:** "ha! I will put in the order now then, hopefully they confirm it quickly"

**CAJIGAL:** "ok lots of thanx!"

15

38. On or about July 27, 2019, at approximately 8:37 p.m., CAJIGAL texted the UC from (630) 822-6361 and requested that the UC call CAJIGAL. The UC did not respond on this date.

39. On or about July 28, 2019, at approximately 7:55 p.m., the UC called CAJIGAL on (630) 822-6361 and informed him that the vendor accepted the order. The UC went on to state, in summary, that the order should be shipped in the next day or two. CAJIGAL asked the UC, "If you don't mind giving me the tracking number so I can see what's going on," to which the UC responded "Of course." The conversation concluded with the UC stating s/he would text CAJIGAL once the tracking number was obtained.

### CAJIGAL Tracked the Package and Met with the UC to Pick Up the Order of Methamphetamine from the UC

40. On or about July 28, 2019, the DEA, in conjunction with the U.S. Postal Inspection Service, created a fictitious tracking number for the package CAJIGAL discussed with the UC, because the UC never actually placed an order for methamphetamine. The fictitious tracking information was designed to show that the package had "shipped" on July 30, 2019, with one-day delivery scheduled for Wednesday, July 31, 2019.

41. Law enforcement created a United States Postal Service Priority Mail shipping box with a shipping label indicating that the parcel had shipped from Fullerton, California, to Mount Prospect, Illinois. The box contained two brick shaped objects that were heavily wrapped in vacuum-sealed bags and green cellophane, and

placed within a gift bag with tissue paper to serve as two pounds of "sham" methamphetamine.





42. On or about July 30, 2019, at approximately 11:45 a.m., the UC texted the fictitious tracking information to CAJIGAL at (630) 822-6361. CAJIGAL confirmed receipt of the tracking information, and he and the UC made plans to meet later in the day on July 31, 2019.

43. On or about July 31, 2019, at approximately 12:25 p.m., the UC texted CAJIGAL at (630) 822-6361, requesting that CAJIGAL call the UC. CAJIGAL texted the UC asking the UC to give him some time as he was "still collecting money" [referring to collecting money to purchase the methamphetamine]. At approximately 1:16 p.m., CAJIGAL, who was using (630) 822-6361, called the UC. This call was recorded. The UC confirmed the package had been received, and CAJIGAL reiterated, in summary, that he was waiting on some money to provide the UC and then he would be on his way.

44. At approximately 3:15 p.m., CAJIGAL, who was using (630) 822-6361, called the UC and indicated he only had a portion of the money, but would soon be on his way to meet the UC. This call was recorded. At 3:39 p.m. CAJIGAL texted the UC from (630) 822-6361 and stated, "I would like u to hold on to my car title as ur leverage till i pay u for those 2lbs." CAJIGAL and the UC agreed, in summary, to meet at the same location as their prior meeting, which was an apartment complex in Mount Prospect, Illinois. At approximately 4:03 p.m., CAJIGAL texted the UC from (630) 822-6361 and stated he was 21 minutes away from the apartment complex.

45. At approximately 4:15 p.m., law enforcement established surveillance in the vicinity of the apartment complex on South Elmhurst Road. The UC also established a covert position within the apartment building.

46. At approximately 4:41 p.m., CAJIGAL texted the UC from (630) 822-6361 and stated he had arrived. At the same time, surveillance officers observed CAJIGAL arrive in the apartment complex parking lot and park his Nissan Maxima.

47. Surveillance officers observed CAJIGAL and a female passenger, Individual A, exit the Nissan and walk towards the front entrance of the apartment building. Moments later, the UC exited the building and greeted both CAJIGAL and Individual A. After a brief conversation, Individual A returned to the Nissan while the UC and CAJIGAL entered into the UC's undercover vehicle, which was already parked in the parking lot. An audio and video recording device was located in the undercover vehicle, and the UC was wearing an audio and video recording device. After entering the undercover vehicle, CAJIGAL provided the UC with an envelope that contained $1,400 and the vehicle title for a 2018 Nissan Maxima in the name of Marc A. Cajigal. CAJIGAL stated, in summary, that the UC should "hold onto this" until CAJIGAL could pay the UC "the rest of the money" [offering the car title as collateral for the UC to hold until CAJIGAL could give the UC the remainder of the money in exchange for the two pounds of methamphetamine].

48. After receiving the money and the vehicle title, the UC retrieved the USPS package containing the "sham" narcotics from the trunk of the undercover vehicle and provided it to CAJIGAL. CAJIGAL opened the package and began to

remove one of the bricks of "sham" narcotics from within. At this time, the UC gave assisting law enforcement personnel an arrest signal. Moments later, as CAJIGAL was in possession of the package containing "sham" narcotics, law enforcement personnel took CAJIGAL into custody without incident.

### Conclusion

49.     Based on the foregoing, I respectfully submit that there is probable cause to believe that on or about July 19, 2019, in Chicago, CAJIGAL knowingly and intentionally distributed a controlled substance, namely, a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

50.     I also respectfully submit that there is probable cause to believe that on or about July 23, 2019, in Chicago, CAJIGAL knowingly and intentionally distributed a controlled substance, namely, a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

51.     Further, I respectfully submit that there is probable cause to believe that on or about July 31, 2019, in Chicago, CAJIGAL attempted to knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

_____

ALISON TEEVAN
Task Force Officer, Drug Enforcement
Administration

SUBSCRIBED AND SWORN to before me on August 1, 2019.

JEFFREY T. GILBERT
United States Magistrate Judge